## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **MSP RECOVERY CLAIMS, SERIES LLC, a Delaware entity,** | |
| **Plaintiff,** | **Case No.:** |
| **v.** | **COMPLAINT** |
| **ENDURANCE AMERICAN SPECIALTY INSURANCE COMPANY,** | **DEMAND FOR JURY TRIAL** |
| **Defendant.** | |

## COMPLAINT

Plaintiff, MSP Recovery Claims Series, LLC ("MSPRC"), a Delaware entity, on behalf of its designated Series, brings this action against Endurance American Specialty Insurance Company ("Endurance" or "Defendant") and alleges:

## <u>INTRODUCTION</u>

1.      More than forty years ago, Congress passed the Medicare Secondary Payer Act (the "Act" or "MSP Act") to deal with ballooning medical entitlement costs, by transforming Medicare from the entity that always foots the bill, into a safety net for the medical expenses of beneficiaries who also were covered by private plans and insurers such as Endurance.

2.      Six years later, Congress recognized that it needed to do more to make this transformation effective and amended the MSP Act to add a private cause of action so persons and private entities could recover secondary payments made by Medicare (and later, by Medicare

Advantage Organizations ("MAOs"))[1] that private plans and insurers had failed to reimburse. Congress provided for double damages, so that private litigants would be motivated to take arms against a recalcitrant insurer.

3.    In 1997, Congress created the "Medicare Advantage" option under Part C of Medicare, 42 U.S.C. § 1395w-21(a)(1)(B), with the hope that Medicare Advantage would eclipse traditional Medicare. Under Medicare Advantage, Medicare enrollees receive their Medicare benefits from private health insurers known as MAOs. Today, nearly 40% of all Medicare beneficiaries receive their benefits under a Medicare Advantage Plan.

4.    Even though it is settled law that MAOs have parity of recovery rights, auto insurers have disregarded for more than a decade their repayment obligations to MAOs. That failure improperly depletes the trust funds that support Medicare Advantage, which are the same trust funds that support Medicare Parts A and B. *See* 42 U.S.C. § 1395w-23(f). Accordingly, Congress' mandate that Medicare shall not be the entity that always foots the bill is still a long way from being implemented. This case seeks to reconcile, in a structured and fair way, claims for reimbursement that Endurance owes to MAOs that assigned their rights to MSPRC, which will more effectively implement Congress' original intent in passing the MSP Act.

### ENDURANCE'S DUTIES TO MEDICARE AND MAOS

5.    Endurance is a property and casualty insurer that is in the business of collecting premiums in exchange for taking on the risk that its insureds will be injured, and Endurance will

---

[1] MAOs include Medicare Service Organizations, Independent Physician Associations, and other first tier and downstream entities (collectively "MAOs"). As the Eleventh Circuit has explained, "some MAOs contract with smaller organizations, like independent physician associations, that have closer connections to local healthcare providers. These smaller organizations, or 'downstream' actors, are also a part of the Medicare Advantage system . . . ." *MSP Recovery Claims, Series LLC v. ACE Am. Ins. Co.*, 974 F.3d 1305, 1308 (11th Cir. 2020), *cert. denied*, 141 S. Ct. 2758 (2021).

be contractually obligated to pay for its insured's accident-related medical care. Endurance also collects premiums in exchange for taking on the risk that its insureds will injure someone else, and Endurance will be required to indemnify its insureds, typically through a settlement agreement that releases the third-party claimant's claim for accident-related medical care.

6.    Under both circumstances, Endurance falls within the MSP Act's definition of a "primary plan," which includes "an automobile or liability insurance policy or plan (including a self-insured plan) or no-fault insurance." 42 U.S.C. § 1395y(b)(2)(A). As a primary plan, Endurance is charged with two duties under the Act: (1) to notify the secondary payer (whether it be Medicare or an MAO) of Endurance's primary payer status, and (2) to repay the secondary payer, within 60 days. 42 U.S.C. §§ 1395y(b)(2)(B)(ii), 1395w-22(a)(4).

7.    If Endurance is rendered a primary plan and fails to repay the Medicare lien within 60 days, the MSP Act automatically gives rise to a right to bring an action such as this one. Failure to reimburse Medicare or MAOs for accident-related medical payments effectively results in a windfall for Endurance, to the detriment of the Medicare trust funds and taxpayers.

## PARTIES, JURISDICTION, AND VENUE

8.    MSPRC is a Delaware series limited liability company with a principal place of business located at 2701 S. Le Jeune Road, 10th Floor, Coral Gables, Florida 33134.

9.    MSPRC is a Series LLC. Under Delaware law, a Series LLC operates similarly to, but not the same as, a corporation and its subsidiaries. MSPRC is the master LLC. Each individual Series entity forms a part of MSPRC, and MSPRC owns and controls each individual Designated Series entity.

10.    MSPRC established various designated series pursuant to Delaware law in order to maintain various claims recovery assignments separate from other company assets, and to account

for and associate certain assets with certain series. All designated series form a part of MSPRC, and pursuant to MSPRC's limited liability agreement and applicable amendment(s), each designated series is owned and controlled by MSPRC.

11.     MSPRC may either (1) receive assignments directly to it from third parties in the name of MSPRC and further associate such assignments with a particular Series, or (2) may have claims assigned directly to a particular Designated Series. In either event, MSPRC possesses the right to sue on behalf of each Designated Series and pursue any and all rights, benefits, and causes of action arising from assignments to a Designated Series by way of its limited liability agreement.

12.     As permitted under Delaware law, MSPRC's limited liability agreement vests in the master LLC the right to initiate and maintain legal proceedings on behalf of its Designated Series entities individually or collectively. Any claim or suit may be brought by MSPRC in its own name, or in the name of its Designated Series, individually or collectively.

13.     MSPRC specifically alleges it possesses valid assignments to bring actions for seeking redress for all claims described herein.

14.     Series 16-11-509 is a Designated Series entity of MSPRC with its principal place of business at 2701 S. Le Jeune Road, 10th Floor, Coral Gables, Florida 33134.

15.     MSPRC made a good faith effort to accurately identify Endurance in this Complaint, in reliance on information obtained from Endurance's website, police crash reports, and reporting data from Insurance Services Office ("ISO") and an independent vendor, MyAbility, which is part of Ability Network. MyAbility allows companies, such as MSPRC, to access data that primary payers report to the Centers for Medicare & Medicaid Services ("CMS"). Reporting data attached as **Exhibit A** to this Complaint is taken directly from data inputted by Endurance to CMS, either directly or through its vendor (such as ISO). Accordingly, any inaccuracy or lack of

specificity in the data is attributable to Endurance.

16.    Endurance is an insurer who issues liability and no-fault policies and is incorporated in the state of Delaware. According to the National Association of Insurance Commissioner's website located at https://sbs.naic.org/solar-external-lookup/lookup/company/summary/9160088?jurisdiction=DE [last accessed on June 28, 2022], its principal place of business is in Purchase, New York.

17.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331.

18.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 (b), (c), and (d) because at all times material hereto, Endurance resided, transacted business, was found, or had agents in this District, and a substantial portion of the alleged activity affecting trade and commerce discussed below has been carried out in this District.

19.    This Court has personal jurisdiction over Defendant because it is at home in this forum, and personal jurisdiction over Endurance does not offend traditional notions of fair play and substantial justice.

## **STANDING ALLEGATIONS**

20.    MSPRC uncovers MSP Act noncompliance through data analytics, which requires cross-referencing unreimbursed, accident-related conditional payments in their assignors' claims data with instances where auto insurers reported to CMS under Section 111 that they were responsible, which made them primary payers under the MSP Act as a matter of law. While MSPRC has no direct access to the Section 111 reporting, MSPRC obtains reports from a subscription service that contracts with CMS and provides to subscribers what primary payers report to CMS.

21.    While this cross-referencing exercise may be successful in identifying some unreimbursed conditional payments, the bulk of those payments remain hidden without discovery. This is so because auto insurers either failed to report all their claims pursuant to Section 111 (which until this year, resulted in no penalty) or withdrew their reports prior to detection by an MAO. The only way to fully identify all secondary payments that auto insurers failed to reimburse is by comparing an MAO's and an auto insurer's claims data.

22.    For the above reasons, the accurate and complete amount of MSPRC's damages cannot be known until after Endurance has produced lists of no-fault and third-party claims that it settled. Accordingly, and solely for the purpose of demonstrating standing to pursue claims against Endurance, and to obtain the discovery MSPRC needs, the following example of Endurance's failures to reimburse and comply with the MSP Act are alleged below.

23.    MSPRC sets forth below allegations related to a representative beneficiary to illustrate Endurance's failure to fulfill its statutory duties to reimburse MSPRC's assignor for conditional payments.  Endurance has these statutory duties: (i) as a direct "no-fault" and/or other liability insurer; and (ii) when entering into settlements on behalf of tortfeasors who are sued by Medicare beneficiaries. In both sets of circumstances, Endurance reported and admitted its primary payer status and responsibility for the accident-related expenses for medical items and/or services provided to beneficiaries for which Emblem made conditional payments.

**Assignment Allegations**

24.    MSPRC's claims in this lawsuit stem from its assignment agreement with AvMed, Inc. ("AvMed"). On June 26, 2019, AvMed entered into a Claims Purchase Agreement & Assignment with Series 17-03-615, a designated series of MSP Recovery Claims, Series LLC, whereby it irrevocably assigned all rights to recover payments made on behalf of its Enrollees (the

"AvMed Assignment"). The AvMed Assignment expressly provides, in pertinent part:

> Assignor irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its designated series, successors and assigns, any and all of Assignor's right, title, ownership and interest in and to (i) all Claims existing on the date hereof, whether based in contract, tort or statutory right, and all related recovery rights arising from and related to the claims data transferred to MSP Recovery (or its affiliates or service providers, including [MSP Recovery]), and (ii) any and all causes of action, claims and demands of any nature whatsoever relating to payments for health care services provided to Assignor's members and enrollees, and legal or equitable rights (including, but not limited to, subrogation) to pursue and/or recover monies related to the Claims that Assignor had, may have had, or has asserted against any party in connection with the Claims; and (iii) all causes of action, claims, rights and demands of any nature whatsoever, legal or equitable, against primary payers, Responsible Parties and/or third parties that may be liable to Assignor arising from or relating to the Claims, including claims under consumer protection statutes and laws (all of the items set forth in (i)-(iii), the "Assigned Claims") . . . . The assignment of the Assigned Claims set forth herein is irrevocable and absolute.

25.    The "Assigned Claims" exclude claims against "[AvMed's] network healthcare providers and current and former members" as well as "[c]laims arising from and related to the GlaxoSmithKline[] manufacturing facility in Cidra, Puerto Rico[.]" *Id*. Defendants are not AvMed "network healthcare providers" or "current [or] former members" and the claims at issue in this action do not relate to the "GlaxoSmithKline's manufacturing facility in Cidra, Puerto Rico."

26.    The AvMed Assignment provided for a due diligence period wherein the parties would exchange deliverables and contemplated that the parties would enter into a separate "Stand-Alone Assignment Agreement" further evidencing the assignment. Upon completion of the prescribed due diligence period, and satisfaction of all conditions precedent, the parties finalized the transaction, including the exchange of compensation and execution of the Stand-Alone Assignment Agreement.

27.    Consideration was given between the parties in executing these agreements.

## The Settlement Representative Beneficiary

28.     In exchange for premiums, Endurance may take on the risk of loss and accident-related medical expenses incurred by third parties who suffered an injury induced by either its customers and/or their covered property. When these instances arise, Endurance executes a settlement agreement on behalf of its insured with the covered persons.

29.     When Endurance executes a settlement agreement with a covered person, who is enrolled in a Medicare plan, Endurance becomes a primary payer that is responsible for the reimbursement of the life-saving medical services rendered to the covered person. Endurance's duty to reimburse conditional payments made by Medicare participants for the health services rendered is nondelegable. Endurance may not transfer its responsibility for reimbursement to covered persons or other third parties.

30.     After executing a settlement agreement, as identified below, Endurance failed to provide actual notice of its primary payer status to AvMed—the Medicare participant who paid for the beneficiary's medical expenses in this instance. Endurance may not rely on state law to shirk its federal statutory reimbursement obligations to the Medicare system. Endurance may not sit and wait, derelict of its federal affirmative duties, and then invoke absolution under state law.

**A.A.**

31.     On December 3, 2014, A.A. was enrolled in a Medicare Advantage Plan issued by AvMed, an MAO and MSPRC's Designated Series assignor in this action.

32.     On December 3, 2014, A.A. was injured in an incident. As a direct and proximate result of the incident, A.A. sustained injuries that required medical items and services. A.A. received these treatments in Florida.

33.     Endurance's insured responsible for the incident was insured under policy number

37865.

34.     A list of A.A.'s diagnosis codes and injuries in connection with A.A.'s accident-related treatment is attached hereto as **Exhibit B**. (For more explanation regarding the format of claims data in this exhibit, *see* Appendix). The medical services were rendered from December 3, 2014, through February 11, 2015. The medical providers subsequently issued bills for payment of A.A.'s accident-related medical expenses to AvMed. The medical providers billed and charged AvMed $7,032.56 for A.A.'s accident-related medical expenses, of which AvMed paid $4,178.43. (*See* **Exhibit B**). At the time AvMed executed its assignment agreement in favor of Series-17-03-615, AvMed's right to seek reimbursement for A.A.'s accident-related treatment was never assigned to and/or pursued by other recovery vendors. AvMed held all recovery rights to A.A.'s accident-related treatment and conveyed them to MSPRC. AvMed did not retain the recovery right to A.A.'s claim.

35.     Following A.A.'s claim against Endurance's insured, Endurance indemnified its insured tortfeasor and made payments pursuant to a settlement with A.A. By virtue of entering into that settlement and obtaining a release of all claims, Endurance became a primary payer responsible for payment and/or reimbursement of A.A.'s accident-related medical expenses.

36.     In fact, Endurance reported information to CMS regarding the accident, the name of the reporting entity, and the type of insurance policy involved. It also admitted its primary payer status related to payment and/or reimbursement of A.A.'s accident-related medical expenses. (See **Exhibit A**).[2] Although Endurance reported as "Endurance Insurance Company," its correct legal name is "Endurance American Specialty Insurance Company." Indeed, Endurance has admitted

---

[2] This same report shows AvMed Medicare Advantage enrollment dating from January 1, 2014, through September 30, 2018.

its name and principal place of business in response to a court order in *Arch Specialty Ins. Co. v. Colony Ins. Co.*, No. CV 19-12570-WGY, 2022 WL 773891 (D. Mass. Mar. 14, 2022), at ECF No. 68. After noting that the "third [amended complaint] updated the name of the defendant 'Endurance American Insurance Company' to 'Endurance American Specialty Insurance Company,'" *id.* at *1 n.2, the *Arch Specialty* court cited Endurance's admission as to its identity: "Endurance is an insurance company . . . with its principal place of business in Purchase, New York and is incorporated in Delaware. *See* Endurance Corporate Disclosure Information, ECF No. 68." *Id.* at *2 n.3. Thus, Endurance's reporting to CMS, as summarized in **Exhibit A**, was done on behalf of the Endurance entity named as the Defendant in this lawsuit.

37.     This reporting demonstrates Endurance was aware of its responsibility to reimburse AvMed.

38.     Despite reporting it was a primary payer, and the corresponding admission it should have paid for A.A.'s accident-related injuries, Endurance failed to remit and/or reimburse such payments.

39.     Endurance was aware of its MSP Act responsibility to reimburse conditional payments advanced for medical services rendered to A.A. Endurance was also aware of its 42 C.F.R. § 411.24(f)(2) duty to notify the Medicare carrier that paid for A.A.'s medical expenses, in this instance AvMed. Endurance did not notify AvMed of its primary responsibility to pay for A.A.'s medical expenses.

40.     In the time since the incident, Endurance has enjoyed the use of AvMed's funds to the detriment of the Medicare system. Endurance has made no remedial attempts to reimburse AvMed. Endurance has also ignored MSPRC's "civil remedy notice," filed with the Florida Department of Financial Services, concerning A.A., who resided in Florida. These notices are used

to alert the Department that an insurer has not complied with its statutory obligations and may be subject to a bad faith lawsuit or other penalties by the Department, using its insurance licensing powers. Additionally, Endurance ignored a fax transmission sent by MSPRC, requesting information as to A.A. and other beneficiaries for whom Endurance reported its primary payer status to CMS.

41.     MSPRC expended a great deal of effort and resources to uncover Endurance's failures in the handling of A.A.'s claims and the unjust enrichment Endurance has benefitted from during this period of noncompliance. As AvMed's assignee, MSPRC instituted this action to recover the debt.

42.     Accordingly, MSPRC is entitled to collect double damages against Endurance for its failure to reimburse AvMed's conditional payment of A.A.'s accident-related medical expenses.

**Statute of Limitations Tolling**

43.     To the extent necessary, the claims asserted in this Complaint have been tolled as a matter of law by the pendency of various class actions, as to which AvMed was a putative class member, alleging MSP Act violations related to the actions by Endurance.[3]

**COUNT I**

**Private Cause of Action Under 42 U.S.C. § 1395y(b)(3)(A)**
**(as to AvMed's unreimbursed payments)**

44.     MSPRC re-alleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs 1-43 as if fully set forth herein.

---

[3] *See MSP Recovery Claims, Series LLC v. Endurance American Insurance Company,* No. 1:20-cv-23219 (S.D. Fla., August 3, 2020).

45.    MSPRC asserts a private cause of action pursuant to 42 U.S.C. § 1395y(b)(3)(A).

46.    Endurance's no-fault and liability policies are primary plans, which rendered Endurance the primary payer for its insureds' accident-related medical expenses.

47.    As part of providing Medicare benefits under the Medicare Advantage program, AvMed paid for items and services which were also covered by no-fault, personal injury protection, or medical payments policies issued by Endurance.

48.    Endurance also entered into settlements with beneficiaries, such as A.A., relating to accidents but failed to reimburse Emblem for accident-related medical expenses paid by Emblem. As a primary payer, Endurance had a nondelegable duty to reimburse conditional payments advanced by Medicare participants for medical services rendered to beneficiaries. Endurance is liable for reimbursement of these accident-related medical expenses, even if it subsequently paid out the maximum benefits under the policies.

49.    Endurance was required to timely reimburse AvMed for conditional payments made on behalf of beneficiaries' accident-related medical expenses.

50.    AvMed suffered damages as a direct result of Endurance's failure to comply with its statutory and regulatory duties under the MSP Act and the corresponding regulations within the Code of Federal Regulations.

51.    Endurance derived substantial monetary benefit by placing the burden of financing medical treatments on AvMed.

52.    Endurance failed to administratively appeal AvMed's rights to reimbursement within the administrative remedies period. Endurance, therefore, is time-barred from challenging the propriety, reasonableness and necessity of the amounts paid.

53.    MSPRC only seeks to recoup accident-related medical services rendered to

beneficiaries.

54.     MSPRC brings this claim pursuant to 42 U.S.C. § 1395y(b)(3)(A), to recover double damages from Endurance for its failure to make appropriate and timely reimbursement of conditional payments for beneficiaries' accident-related medical expenses.

## COUNT II

### Declaratory Relief Pursuant to 28 U.S.C.
### § 2201 (as to AvMed's unreimbursed payments)

55.     MSPRC re-alleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs 1-43 as if fully set forth herein.

56.     MSPRC alleges that as part of providing Medicare benefits under the Medicare Advantage program, AvMed paid for items and services which were also covered by no-fault, personal injury protection, or medical payments policies issued by Endurance.

57.     Endurance entered into settlements with beneficiaries relating to accidents but failed to reimburse AvMed for accident-related medical expenses paid by AvMed. As a primary payer, Endurance had a nondelegable duty to reimburse conditional payments advanced by Medicare participants for accident-related medical services rendered to covered persons. Endurance is liable for reimbursement of these accident-related medical expenses, even if it subsequently paid out the maximum benefits under the policies.

58.     Endurance was required to timely reimburse AvMed for conditional payments made on behalf of beneficiaries' accident-related medical expenses.

59.     An actual, present, and justiciable controversy has arisen between MSPRC and Endurance concerning its obligation to reimburse AvMed.

60.     MSPRC seeks a declaratory judgment from this Court establishing that Endurance has a historical, present, and continuing duty to reimburse AvMed for payments made on behalf

of beneficiaries' accident-related medical expenses. MSPRC also seeks a declaration of what amounts are due and owing by Endurance to AvMed.

61.     A determination of what amounts are owed by Endurance to AvMed is complicated and difficult.

62.     A coordination of benefits process requires plans to share information between the primary payer and secondary plan and to act in good faith.

63.     The Code of Federal Regulations defines the coordination of benefits system as a "coordination of benefits transaction."[4]

64.     The coordination of benefits transaction involves the exchange of thousands of claims data and data points between the parties to determine overlapping instances where AvMed made payment of medical items and services on behalf of a Medicare beneficiary who was entitled to the benefit of insurance coverage provided by Endurance. This includes not only instances in which a Medicare beneficiary was directly insured by Endurance, but also instances in which a Medicare beneficiary was injured by Endurance's policyholder.

65.     The exchange of claims data would need to be done by extracting and producing certain data fields from Endurance's and MSPRC's databases by using demographic identifiers, such as Social Security Number ("SSN"), Health Insurance Claim Number ("HICN"),[5] date of birth, sex, and address. Beneficiary matching pinpoints the number of relevant insureds and simplifies the process of identifying reimbursable claims, which is done by matching the date of

---

[4] The "coordination of benefits transaction" is the transmission of claims data from any entity to a health plan for the purpose of determining the relative payment responsibilities of the health plan, of either of the following for health care: (a) claims and (b) payment information. 45 C.F.R. § 162.1801.

[5] Also known as a Medicare Beneficiary Identifier ("MBI").

loss (for Endurance), with dates of payment (for MSPRC), and then discovering what Endurance reimbursed (if anything), and to whom.

66.     The data MSPRC requests from Endurance to perform an accounting is information MSPRC is already entitled to without litigation. 42 C.F.R. § 411.25(a); 59 Fed. Reg. 4285.

67.     Endurance refused to share any information, including but not limited to (1) refusing to respond to "civil remedy notice" correspondence sent to Endurance via the Florida Department of Financial Services, and (2) refusing to respond to a fax communication, requesting information as to A.A. and other representative beneficiaries.

68.     Given the size of the claims and data points being exchanged between the parties, the coordination of benefits transaction is complex.

69.     An equitable accounting of the amounts owed MSPRC by Endurance is proper because the facts and accounts presented are so complex that adequate relief may not be obtained at law.

70.     MSPRC is entitled to an accounting of all instances where Endurance settled a tort claim under a third-party insurance policy or accepted coverage under a first party insurance policy. This accounting should include, at a minimum, the identity of each claimant for whose benefit AvMed provided or paid for items or services.

71.     MSPRC is attempting to coordinate with Endurance for an exchange of information, but Endurance has thus far resisted providing information in response to MSPRC's "civil remedy notice" and prior lawsuits.

72.     Thus, MSPRC lacks an adequate legal remedy to obtain the requested information, and an accounting is the appropriate remedy.

## JURY TRIAL DEMAND

MSPRC demands a trial by jury on all of the triable issues within this pleading.

## PRAYER FOR RELIEF

WHEREFORE, MSPRC seeks a judgment granting the following relief:

i.  a judgment awarding reimbursement of double damages for those amounts to which MSPRC is entitled under 42 U.S.C. § 1395y(b)(3)(A), as alleged in Count I;

iii. a judgment declaring that Endurance has a historical, present, and continuing duty to reimburse AvMed for payments made on behalf of beneficiaries' accident-related medical expenses as alleged in Count II;

iv. a judgment ordering an accounting of all instances where Endurance settled under a third-party insurance policy or accepted coverage under a first party insurance policy, including the identity of each claimant, or if known to Endurance, claimants for whose benefit AvMed provided or paid for items or services;

v.  a judgment awarding MSPRC pre-judgment and post-judgment interest consistent with the statute; and

vi. a judgment awarding MSPRC such other and further relief as the Court deems just and proper under the circumstances.

Dated: August 5,  2022.                    Respectfully submitted,

**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**

/s/ *Martha A. Geer*
Martha A. Geer
900 W. Morgan Street
Raleigh, NC 27603
Telephone: (919) 600-5000
Facsimile: (919) 600-5035
mgeer@milberg.com

## APPENDIX

### CMS' Standard for Storing Digital Health Insurance Claims Data

1.      It is the custom and practice of CMS and Primary Payers to maintain records in a detailed electronic format. According to the U.S. Department of Health and Human Services (HHS), CMS, federal statutes, and industry best practices and guidelines, the standard format for storing digital health insurance claims data is an electronic data interchange ("EDI") format called 837P ("837").

      a.   The 837 standard is mandated by the federal government and used federal and state payors such as Medicare and Medicaid.

      b.   The 837 standard is also used by private insurers, hospitals, clinics, physicians and other health care providers (i.e., HIPAA covered entities) who typically adopt CMS standards.

      c.   Paper claims are captured in the CMS 1500, UB04, and UB92 forms, but electronically, the standard for storing data is the 837 format.

2.      Essential components of an 837-claim file include but are not limited to the date(s) of service, diagnosis code(s) and medical procedure code(s).

      a.   Dates (including dates of service): the standard format for dates in electronic health care claims is YYYYMMDD, CCYYMMDD, or MM/DD/YYYY.

          i.   According to industry best practices and guidelines, and HHS and CMS, the standard format for expressing dates in healthcare insurance claims data is CCYYMMDD (CC representing two numeric digits to indicate Century, YY representing two numeric digits for year, MM representing two digits for the month, and DD representing two digits for the day of the month).

Sometimes this is alternately expressed as YYYYMMDD. [1]

    ii.  The CCYYMMDD date format standard has been in place for many years. *See* CMS Guidance for 2010[1], 2011[2], 2012[3], 2013[4], 2014[5], and 2016.[6]

   iii.  CMS has also accepted the MM/DD/YYYY format for its local coverage determination data.[7]

---

[1] *See* the Medicare Claims Processing Manual Chapter 3 and CMS Manual System, Pub 100-08 Medicare Program Integrity, Transmittal 721.

[1] CMS Manual System, Pub 100-20 One-Time Notification, Transmittal 761 (Aug. 20, 2010), *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/downloads/R761OTN.pdf.

[2] CMS Manual System, Pub 100-20 One-Time Notification, Transmittal 988 (Oct. 28, 2011), *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/downloads/R988OTN.pdf.

[3] CMS Manual System, Pub 100-20 One-Time Notification, Transmittal 1050 (Feb. 29, 2012), *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/Downloads/R1050OTN-.pdf.

[4] CMS Manual System, Pub 100-20 One-Time Notification, Transmittal 1277 (Aug. 9, 2013), *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/downloads/R1277OTN.pdf.

[5] Memorandum from Tracey McCutcheon, Acting Director, Medicare Drug Benefit and C & D Data Group, and Laurence Wilson, Director, Chronic Care Policy Group, to All Part D Plan Sponsors and Medicare Hospice Providers (Mar. 10, 2014) (on file with author), *available at* https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/Hospice/Downloads/Part-D-Payment-Hospice-Final-2014-Guidance.pdf.

[6] Memorandum from Cheri Rice, Director, Medicare Plan Payment Group, and Cathy Carter, Director, Enterprise Systems Solutions Group, to All Medicare Advantage, Prescription Drug Plan, Cost, PACE, and Demonstration Organizations Systems Staff (Nov. 9, 2016) (on file with author), *available at* https://www.cms.gov/Research-Statistics-Data-and-Systems/CMS-Information-Technology/mapdhelpdesk/Downloads/Announcement-of-the-February-2017-Software-Release.pdf.

[7] Local Coverage Determination (LCD) Date of Service Criteria, *available at* https://www.cms.gov/medicare-coverage-database/search/lcd-date-search.aspx?DocID=L35093&bc=gAAAAAAAAAAAA.

iv. The purpose of the date format is to ensure that dates of health care claims such as the date a medical procedure was provided (date of service or "DOS") in comparison to the date of settlement, can be searched, sorted and properly selected as compensable or non-compensable claims.

v. In general, ensuring the accuracy of dates, and other data is essential to analyzing claims data files by health insurers and others who may need to determine the value of claims, the relevance of particular claims with respect to patient conditions, dates of care, or whether the claim is compensable.

b. <u>Medical Diagnosis and Procedure Codes</u>:

i. Diagnosis-Related Group (DRG) – DRGs are a statistical system of classifying any inpatient stay into groups for the purposes of payment. The DRG classification system divides possible diagnoses into more than 20 major body systems and subdivides them into almost 500 groups for the purpose of Medicare reimbursement. Factors used to determine the DRG payment amount include the diagnosis involved as well as the hospital resources necessary to treat the condition.[89]

---

[8] Gillian I. Russell, Terminology, in FUNDAMENTALS OF HEALTH LAW 1, 12 (American Health Lawyers Association 5th ed., 2011).

[9] Beginning in 2007, CMS overhauled the DRG system with the development of "severity-adjusted DRGs" and began to replace DRGs with "Medicare-severity DRGs" or "MS-DRGs" through a three-year phase-in period that blended payment under the old DRG system and the MS-DRG system. In a small number of MS-DRGs, classification is also based on the age, gender, and discharge status of the patient. The diagnosis and discharge information is reported by the hospital using codes from the ICD-9-CM or ICD-10-CM if the date of service is on or after October 1, 2015.

ii. International Classification of Diseases (ICD-9 and ICD-10) – Hospitals report diagnosis information using codes from the ICD-9-CM (the International Classification of Diseases, 9th Edition, Clinical Modification if the date of service is before October 1, 2015) or ICD-10 CM (if the date of service is on or after October 1, 2015).

iii. Inpatient medical procedures ICD-9 Volume 2 and Volume 3 and ICD-10 PCS – These codes are used to describe inpatient medical procedures, excluding the physician's bill.

iv. Current Procedural Terminology ("CPT") – CPT[10] codes are a standardized listing of descriptive terms and identifying codes for reporting outpatient medical services and procedures as well as both inpatient and outpatient physician services. The current version, CPT-4, is maintained by the American Medical Association and is an accepted standard by the National Committee on Vital Statistics or NCVHS.[11]

v. Ambulatory Patient Classification (APC) – Services performed in outpatient ambulatory surgery centers may be classified by APCs. CMS assigns individual services to APCs based on similar clinical characteristics

---

[10] CPT codes and descriptions are copyrights of the American Medical Association Current Procedural Terminology.

[11] National Committee on Vital and Health Statistics, Consolidated Health Informatics Initiative, *available at* http://www.ncvhs.hhs.gov/meeting-calendar/agenda-of-the-december-9-10-2003-ncvhs-subcommittee-on-standards-and-security-hearing/consolidated-health-informatics-initiative-final-recommendation-information-sheet-billingfinancial-for-the-december-9-2003-ncvhs-subcommittee-on-standards-and-security-hearing/.

and similar costs.[12]

vi.  Healthcare Common Procedure Coding System (HCPCS) – HCPCS is mainly used to indicate medical supplies, durable medical goods, ambulance services, and durable medical equipment, prosthetics, orthotics and supplies (DMEPOS).[13]

vii.  Medical Data Code Sets – The standard Code set for medical diagnosis and procedure codes in health care claims is a series of digits as specified in 45 C.F.R. § 162.1002.

viii.  The purpose of standard diagnosis code sets is to use a universal terminology in describing patients with certain conditions to determine compensable or non-compensable claims.

ix.  CMS primarily utilizes two systems of classification: (1) International Classification of Diseases ("ICD-9" and "ICD-10") medical diagnosis codes; and (2) Current Procedural Terminology ("CPT-4") procedure codes. *See* 45 C.F.R. § 162.1002.

---

[12] CMS, Hospital Outpatient Prospective Payment System, Partial Hospitalization services furnished by hospitals or Community Mental Health Centers, Ambulatory Payment System, https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/downloads/HospitalOutpaysysfctsht.pdf.

[13] American Academy of Professional Coders (AAPC), https://www.aapc.com/resources/medical-coding/hcpcs.aspx.